No. 29,705.

G. W. Gates, *Appellant*, v. The Syndicate Oil Corporation, *Appellee*.

(295 Pac. 649.)

Opinion filed February 7, 1931.

A. R. Enfield and Frederick G. Apt, both of Iola, for the appellant.

Robert C. Foulston, George Siefkin, Sidney L. Foulston, Lester L. Morris, George B. Powers, Carl T. Smith, all of Wichita, and Clay C. Carper, of Eureka, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by G. W. Gates, an oil driller, for specific performance of an alleged contract with the Syndicate Oil Corporation, compelling it to transfer to him an interest in an oil lease in consideration of his drilling an oil well. The defendant prevailed, and plaintiff appeals.

The defendant was a Rochester, N. Y., concern that was engaged in the production of oil and gas and in the operation of oil and gas leases. In its operations in Kansas it was represented by C. L. Hoyt with power to secure leases and contracts for submission to and approval or rejection by the defendant. H. E. Jackman was the president of the defendant corporation and was in the active management of its business. Hoyt had been in negotiation with the Phillips Petroleum Company for an interest in what is designated as the "Edwards Lease," on the basis that the defendant would drill a well thereon for a half interest in the lease. Hoyt had talked with Gates about drilling a well for an interest in the event that a contract was made between defendant and the Phillips Petroleum Company. The deal with the Phillips company was subsequently consummated and the contract reduced to writing. Before its completion Hoyt communicated with the defendant as to the drilling of the well, in a letter and telegram to and from defendant, prior to the making of the contract with the Phillips company. Afterwards Gates entered upon the drilling operation and oil in paying quantities was found, and he then claimed an interest rather than the usual price which he charged per foot for drilling. No formal written contract between Gates and the company for the work was made, but he contended that the letter and telegram mentioned were sufficient to make a valid contract and take the transaction out of the statute of frauds. There is little controversy about the facts and upon them the court concluded that the letter and telegram relied on were not a sufficient memorandum in writing to take the same out of the statute of frauds or to form the basis for an enforceable contract. A summary of the material findings of the court which appear to be sustained by the evidence follows: The court, after finding that Hoyt was the agent of defendant with power to secure leases and contracts for submission and acceptance or rejection by the defendant, and that he was managing and operating leaseholds of the defendant in Kansas, and further that Jackman

was the president of the defendant and in active management of its affairs, found that on July 27, 1928, Hoyt entered into negotiations with the Phillips company for a half interest in the Edwards lease then owned by that company, on the condition that the defendant would drill a well thereon at its expense for a half interest in the leasehold. On August 23, 1928, these negotiations terminated in a written agreement on the terms named. Before that agreement was consummated Hoyt informed Gates of the proposal and asked him if he would undertake to drill a well for a quarter interest in the lease, and Gates replied that he would. Prior to the making of the agreement with the Phillips company Hoyt wrote a letter to the defendant, stating in substance that the Phillips Petroleum Company had proposed that they would give defendant a one-half interest in the Edwards lease if defendant would at its own expense drill a well on it. He further stated in the letter that it looked like a good play to him because of the location of wells in the neighborhood as shown by a sketch which he inclosed. He itemized the cost of the well, in case it resulted in a dry hole, to be about $6,500. He also stated that, "in case the company does not wish to take the entire gamble we can do the same as we drilled the Fuller lease; that is, the company put in the derrick, pipe, fuel and water, and Gates will drill the well, each for one-half interest. In this way I believe the company's interest in the play will not exceed $2,050," stating the items making up that amount. And he also added, "If this deal interests you or not, please wire and state which of the two plays you wish to take, if either." Upon the receipt of this letter, Jackman answered by telegram as follows:

"Letter just received; accept Phillips deal with Gates for one-fourth interest, if you recommend. Write your opinion future possibilities, gas proposition, where dry hole drilled."

This was signed by H. E. Jackman. There is a finding that Gates had drilled approximately twenty-eight wells for the defendant, most of which were on the basis of $2 per foot for drilling to the sand and per diem compensation while drilling in and completing wells. It had not been the custom to pay Gates any part of the cost of drilling the well until after the well was completed, when they were being drilled on the basis of $2 per foot. Gates had drilled at least three wells for defendant for an interest in the lease, and one of them at least had been drilled under a written contract. About September 15, 1928, the defendant caused to be erected on

the lease the derrick, and Hoyt notified plaintiff that he could move on it with his drilling equipment, and on September 20, 1928, Gates began drilling the well and completed it about October 11, when oil in paying quantities was found. Gates paid the bills for drilling, including labor, and had furnished all machinery and drilling equipment, and this was done at a cost of $3,120. The defendant furnished derrick, water, fuel and casing. The flush production of the well when completed was 200 barrels per day, and was still making about fifty barrels per day. All the negotiations with reference to the drilling of the well were had by plaintiff with Hoyt, and at no time did Hoyt advise the defendant under what conditions. or plan the well was being drilled. The president of the defendant at various times during the drilling requested Hoyt to obtain a written contract with Gates, embodying the terms on which the well was to be drilled, if it was to be drilled for a one-fourth interest to Gates, but no such contract was ever entered into or executed. Subsequent to the time that Hoyt had conferred with Gates about drilling the well the plaintiff entered into an agreement with Hoyt, and one Peck and one Enfield, that each should have an undivided one-fourth of his interest in the lease in consideration that each should pay one-fourth of the cost incurred by plaintiff in the drilling of the well. Jackman knew that Gates was engaged in drilling the well, but at no time during the drilling or before was he or his corporation notified by Gates or Hoyt or anyone else that Gates was drilling for a one-fourth interest in the lease, nor was he notified that Hoyt, Peck and Enfield claimed an interest therein. When the contract with the Phillips company was forwarded to defendant, Hoyt was away and Peck looked after the contract, and in a letter to Jackman transmitting the contract he said: "This looks like a very good play and we should get some very good production on this lease. . . . Trust the contracts inclosed will meet with your approval and the lease turn out to be a good one for all of us," to which he signed his name. In answer to this letter inclosing the original contracts of the Petroleum Company, Jackman wrote, among other things, that, "We understand from Carroll's letters of July 27, and our reply by wire of July 30, that Gates *et al.* are to take one-half of our interest in this contract in consideration of Gates drilling the well." The court found that—

"It would appear from the use of the expression 'for all of us,' and '*et al.*,' in these letters, that Jackman had information of the fact that others than the

plaintiff were interested in the drilling of the well, and the lease, but from the evidence in the case the court is not able to find that he did have any definite information that others were so interested, or who they were."

It was further found that Gates acted in good faith in the performance of his agreement to drill the well and completely did all the things required of him in the work. About November 7 the Phillips Petroleum Company executed and delivered to the defendant its assignment of an undivided one-half interest in and to the leasehold, and since that time it had been the record holder of such undivided interest. On November 27, 1928, Gates wrote the company, making a demand that it execute and deliver a proper assignment of an undivided one-fourth interest in the leasehold, but the defendant refused to make and deliver the assignment and has continued in such refusal. After the well was completed and on or about November 30, 1928, the defendant tendered to plaintiff the sum of $3,680 for his services in drilling the well at the rate of $2 per foot for drilling to the sand and per diem compensation for drilling in and completing the well, and that tender is still kept good. On the basis of these findings the court, as stated, held that the letter and telegram mentioned did not constitute a valid contract and were not sufficient to take the same outside the statute of frauds.

The principal question presented is, Did the letter and telegram mentioned constitute a valid contract between plaintiff and defendant? To be valid within the statute of frauds it was essential that it be in writing. (*Robinson v. Smalley,* 102 Kan. 842, 171 Pac. 1155; *White v. Green,* 103 Kan. 405, 173 Pac. 974.) We think the trial court correctly held that the writings were not sufficient to take the transaction without the statute. It is conceded that a single writing or an assignment of the interest is not necessary to take the case out of the statute and that it may be done by a series of writings or memoranda, but the writings taken together must of themselves be such as to show the necessary elements of a contract. In *Ross v. Allen,* 45 Kan. 231, 25 Pac. 570, it was said that:

"While the form of the memorandum is not material, it must state the contract with reasonable certainty, so that the substance can be made to appear and be understood from the writing itself or by direct reference to some extrinsic instrument or writing without having recourse to parol proof." (p. 241.)

It may be noted that the letter and telegram left essential elements of a contract to parol proof, and where part of them are in

parol, they are deemed to be within the inhibition of the statute. In a case involving the validity of an oil lease it was said:

"Such an agreement is not binding unless all the terms and conditions are agreed on and nothing is left to future negotiation. . . . The contract indicated the amount of rental to be inserted in the blank for that purpose, but the date on which payment of rental should begin in order to save the lease from termination because no well was commenced was not fixed by the contract. The time limit within which a well should be commenced or rental begin was a subject of primary importance. Producer's form 88 made the subject material. The contract was silent about it, the lease could not be written without further negotiation respecting its terms, and so the contract was not binding." (*Grow v. Davis,* 110 Kan. 214, 217, 218, 203 Pac. 683. See, also, *Wing v. Mollett,* 115 Kan. 116, 222 Pac. 88.)

The writings we have here do not indicate how or on what part of the lease a well was to be located, how deep it should be drilled, the time when it should be commenced, or the time when an assignment should be made. In the letter Hoyt suggested that a well might be drilled on the terms upon which the Fuller lease had been, but there was nothing in the writing to show the terms upon which that was done. The telegram from Jackman in response to Hoyt's letter suggesting the giving of an interest to Gates for drilling was not an acceptance of a proposal by Gates to give him a one-fourth interest for drilling the well. It was no more than a statement that that plan might be adopted if Hoyt recommended it. The record, however, does not disclose that such a recommendation was made. These writings were a tentative exchange between defendant and its agent in which the plaintiff did not engage. It occurred before the contract with the Phillips Petroleum Company had been completed, and before any of the parties knew that a lease would be obtained from the Phillips company upon which Gates or defendant would have any interest in it or that either would have an opportunity to drill a well thereon. The assignment by the Phillips Petroleum Company was not executed for months after the letter and telegram were written and, as shown, there was no communication between plaintiff and defendant as to the contract. The exchanges were between defendant and its agent, who had no authority to make contracts, but only to submit propositions for the acceptance or rejection of the defendant. The president of the company knew that drilling had been done, but he expected that a contract would be prepared stipulating the conditions and terms under which the work would be done. The

plaintiff at no time advised the defendant under what conditions or plan the well was being drilled, nor did Hoyt ever advise the defendant that plaintiff was drilling the well for a one-fourth interest in the lease. The defendant, it appears, was not advised by either plaintiff or Hoyt that the plaintiff was to have an interest in the lease for the drilling, and it also appears that during the drilling the president of defendant requested Hoyt to procure the execution of a written contract with plaintiff stating the terms upon which the well was to be .drilled, but this was never done. Hoyt with two others, it appears, had arranged with plaintiff for an interest in the lease, evidently on the theory that it was to be drilled on. the basis of an interest, but at no time was the president or his company notified by Gates or Hoyt that anyone else than Gates was engaged in drilling the well for an interest in the lease, nor that these three parties had any interest therein.

Plaintiff contends that where work has been performed under a parol contract, one required to be in writing, such performance will operate to take the case out of the statute. The statute has declared every parol contract concerning lands is within the statute of frauds and is unenforceable. An exception has been made where the damages cannot be compensated in money. Here the compensation can be made in money and is therefore not within the exception. (*Engelbrecht v. Herrington*, 103 Kan. 21, 172 Pac. 715.) The record discloses that the plaintiff had drilled several other wells for defendant, twenty-eight in number, for money compensation at the agreed price of $2 per foot. We are unable to uphold other contentions of plaintiff, and conclude that the contract was within the inhibition of the statute and hence plaintiff was not entitled to specific performance.

The judgment is affirmed.