No. 36,269

Maria Elizabeth Riffel, *Appellant* (The Derby Oil Company and E. K. Carey, *Cross-appellees*), v. Frank H. Dieter and Anna Ruth Dieter, *Appellees* and *Cross-appellants;* R. W. Hoffman, Mabel C. Hoffman and S. P. Loomis, *Appellees.*

(157 P. 2d 831)

Opinion filed April 7, 1945.

*Harvey C. Osborne* argued the cause, and *Chas. G. Yankey, John G. Sears, Jr.,* and *Verne M. Laing,* all of Wichita, were on the briefs for the appellant and cross-appellee Derby Oil Company. *Lester L. Morris,* of Wichita, argued the cause for cross-appellee E. K. Carey.

*W. M. Beall,* of Clay Center, and *Matt Guilfoyle,* of Abilene, argued the cause, and *John H. Lehman* of Abilene, and *D. M. Ward,* of Peabody, were on the briefs for the appellees and cross-appellants.

The opinion of the court was delivered by

HOCH, J.: This was an action by three plaintiffs to quiet title to real estate as against a certain oil and gas lease. One of the plaintiffs appeals and one of the several defendants cross-appeals. Statement of the issues presented can best be made after further recital.

Clarity may be promoted by first identifying the parties and stating their relation to this appeal. Maria Riffel, plaintiff, and her husband, John Riffel, now deceased, were owners of the land involved. The trial court refused to quiet her title and she appeals. Derby Oil Company and Carey, the other plaintiffs, are assignees of an oil and gas lease executed in 1943 by Maria Riffel and are producing under the lease. Their title was quieted. Dieter, the principal defendant, claimed to have a lease under an alleged contract made with the Riffels about fifteen years prior to the Derby and Carey lease. He asked that his lease be quieted as against all the plaintiffs and that if his lease be held invalid Maria Riffel be ordered to execute a lease to him. Also, by way of alternative relief, he asked judgment against Maria Riffel for $15,000. The trial court having held against him, in part, he cross-appeals against all three plaintiffs. The Hoffmans and Loomis, also party defendants and holders of certain royalty interests, had a controversy as to division of royalty which was adjudicated and no appeal taken. They have

no direct interest in this appeal, as their royalty interests are not disputed either by appellant or cross-appellant.

The trial court made findings of fact and conclusions of law, presently to be quoted in part. For the sake of brevity we first summarize from the findings some of the facts that are not disputed. The word lease, as hereinafter used, means an oil and gas lease.

In 1908 John Riffel acquired title to the *south half* of section 10, township 17 south, range 4 east of sixth P. M. in Marion county.

On September 26, 1926, Riffel and wife executed a lease to one Skow covering the *southwest quarter* of said section 10. This lease was for five years and expired by its own terms on September 27, 1931, no production having been secured on that quarter.

On January 18, 1927, Riffel and wife gave a five-year lease to one Frank covering the *south half* of the *southeast quarter* of section 10. There was production under this lease during the primary term which has since continued.

On January 21, 1927, John Riffel deeded both quarters to his wife but this deed was not recorded until October 28, 1936.

On September 14, 1927, John Riffel and wife executed to Dieter an instrument designated "Sale of Oil and Gas Royalty"—which we will call Contract A. This instrument was recorded on September 30, 1927.

On September 15, 1927, John Riffel and Dieter signed an instrument which we will call Contract B. This instrument was not signed by Mrs. Riffel and was not recorded. The controversy here centers largely around the construction and the effect of these two instruments. Both Contracts A and B related to all of the southwest quarter and all but forty acres of the southeast quarter. No drilling operations have been conducted under either of these contracts.

On January 21, 1943, Maria Riffel—her husband having died—executed to one Reed a lease on the southwest quarter, the only part of the land here involved. It was for a term of one-half year and as long as oil or gas should be produced. Reed assigned this lease to Derby and Carey on May 3, 1943, and under it three wells have been drilled by the lessees, two of them being producers.

On May 11, 1943, the Hoffmans, the Dieters, and Loomis, claiming the right to do so under Contracts A and B, made a lease to Dieter. Thereafter, and upon November 30, 1943, this action was brought by Riffel, Derby and Carey to cancel the Dieter pretended lease and to quiet title to all lease rights as against the defendants.

We first dispose of some matters incident to the main issues. The trial court found (Finding No. 11) that Derby and Carey and their assignor Reed did not know of the execution of Contract B at the time Reed took the lease or when he assigned it. This finding is amply supported by evidence and we shall treat it as an established fact. The trial court found (Finding No. 6) that at the time Contract A—signed by Riffel and wife and Dieter—was executed, Contract B "was executed simultaneously and for the same consideration and after full negotiation with both Maria Elizabeth Riffel and John Riffel, which contract was executed by John Riffel and Frank H. Dieter," and was "delivered simultaneously and as a part of the same consideration" for Contract A. We think this finding is also well supported by the evidence and shall treat it accordingly.

In the same class is the trial court's finding (No. 22) that Dieter made no demand upon Maria Riffel for a lease until after she executed the lease to Reed in 1943. The court also found (Finding No. 13) the market value of the lease on the land involved was $15,000 at the time Reed got the lease from Maria Riffel and assigned it to Derby and Carey. We reserve comment as to that finding. Many of the other findings of fact relate to disputes as to royalties which need not be noted, as they are not involved in this appeal.

Before giving the trial court's conclusions of law it is well to set out Contracts A and B (omitting parts not here material) around which the issues largely turn.

Contract A, designated "Sale of Oil and Gas Royalty," executed September 14 and recorded September 30, 1927, provided:

"It is expressly agreed and understood in this conveyance that all oil and gas reserved or any money received for oil or gas by said Grantor, heirs or assigns, under said present lease, or under any other lease or leases on said land, shall be called Royalty.

"Now therefore, in consideration of the sum of One dollar ($1.00) and other valuable considerations, the receipt of which is hereby acknowledged, the said grantor does hereby grant, bargain, sell and convey unto the said grantee *a ½ interest in and to the said royalty rights* reserved to the said Grantor under said lease, or under any other lease or leases which may hereafter be given or granted by said Grantor, his heirs or assigns and the said Grantor in giving or granting any other lease or leases hereby agrees to reserve unto the said Grantee, heirs or assigns, the same interest in royalty right as is reserved under the present existing lease.

"Provided, However, That upon the expiration or forfeiture of the present existing lease, the said Grantor, heirs or assigns, shall have the right to lease said land for oil or gas and receive all the bonus and rentals paid by lessee

and *if no oil or gas well be drilled on said land under the present lease said Grantor, heirs or assigns, agree to make a second lease, insuring development of said land for oil and gas within one year after the expiration or forfeiture of said present lease,* and if the grantor, heirs or assigns, are unable to make such a lease with a responsible company *within six months after the expiration or forfeiture of said present lease, said Grantee, heirs or assigns shall have the right to secure such a lease on said land.*

"If no oil or gas is found or produced on said land this agreement shall remain in force for a term of 12 years from the date first above written, but if oil and gas or either of them is found or produced on said land *this agreement shall continue and the royalty rights of Grantee shall continue so long and whenever oil or gas is produced from said land.* . . . Grantee waives any claim to rentals or lease money. . . .

Signed, JOHN RIFFEL,

ELIZABETH RIFFEL"

(Italics supplied)

## Contract B provided:

"Whereas: Sept. 14, 1927, John Riffel sold for $5,000 certain oil & gas royalty and other rights to Frank H. Dieter on his 280 land in S½ 10 and 40 in NW¼ NW¼ Sec. 14 all in twp. 17 S R4 E. Marion County. It is desired make terms of proposed purchase by Dieter more clear. There are three separate oil leases on this land paying John Riffel $320 per year for annual rental. John Riffel is to keep all of this annual lease money, Dieter waives any claim to same.

"If no commercial oil & gas well is struck on any of these leases and it lapses for that or any other reason Riffel shall be entitled to make a new lease for the lease that lapsed *but the new lease must be made for a one year term, from the date original lease lapsed* and John Riffel is to keep all of the bonus money that he gets for this lease. But, *if there is no producing oil & gas well drilled on lapsed lease during that one year term, that when that year is up all of Riffel's oil & gas lease rights expire and all belong to Dieter on any lease that so lapses.*

"John Riffel agrees that *within one year after any of the leases lapse and he has been unable to get a producing oil & gas well drilled on the lease,* then *that oil & gas lease belongs to Dieter.* And John Riffel agrees that at any time during the life and existence of the royalty on that land, that he will, *upon the demand of Dieter immediately make and execute to Dieter a valid oil & gas lease identical to the oil lease that is now on record* and lapses. The leases are now on record at Marion and are now existing, except that in the new lease that Riffel agrees to give to Dieter, *Dieter shall not have to pay any lease money & rentals to Riffel* to keep the leases in force and full effect and the lease or leases shall stay in full force and effect just so long as this royalty contract which Riffel made to Dieter is in full force and effect.

Dated this 15th Sept. Year 1927. 9-15-1927.

JOHN RIFFEL,

FRANK H. DIETER,"

(Italics supplied)

The trial court's conclusions of law, here material, were:

"1. The instrument [Contract A] designated 'Sale of Oil & Gas Royalty' and set out in Finding of Fact No. 5, is a royalty assignment and not a conveyance of oil and gas in place.

"2. The pretended lease by the defendants R. W. Hoffman and Mabel C. Hoffman, his wife, Frank H. Dieter and Anna Ruth Dieter, his wife, and S. P. Loomis to Frank H. Dieter, referred to in Finding No. 10, is void, and conferred no rights on defendant Frank H. Dieter.

"3. The instrument attached to the Answer and Cross-Petition, marked Exhibit A [Contract B], and set out in finding of fact No. 6, signed by John Riffel and Frank H. Dieter, is a valid option entitling Frank H. Dieter to a lease upon the premises therein described.

"4. Maria Elizabeth Riffel is bound by the said instrument mentioned in Conclusion No. 3.

"5. The lease from Maria Elizabeth Riffel to Carl J. Reed, mentioned in Finding of Fact No. 9, and attached to plaintiff's petition as Exhibit A, and the assignment of the lease to The Derby Oil Company and E. K. Carey, was without notice of any rights to Frank H. Dieter, mentioned in Conclusions Nos. 3 and 4 and the title of The Derby Oil Company and E. K. Carey should be quieted against the same."

We note first the principal contentions of Dieter, cross-appellant. They may fairly be summarized as follows:

1. Contract A conveyed to him two interests; first, a one-half interest in the *royalty* (⅛ of production) on any production from the 280 acres covered by the agreement, for a term of twelve years and if production was had during the term as long thereafter as production continued; second, the *right to a lease* on any part of the land, provided Riffel did not make a lease insuring development within one year after the expiration of any existing lease.

2. His right to a lease became vested when Riffel did not make such a lease within the stipulated period after the Skow lease expired on September 27, 1931.

3. Contract A, being recorded, was notice to Reed, Derby and Carey of his right to such a lease.

4. Derby and Carey had actual information as to his claim of lease rights before they moved any tools onto the land for purpose of development, and therefore cannot assert that they were innocent purchasers.

5. The burden was upon Derby and Carey to prove that the lease to Reed and Reed's assignment to them were for valuable consideration and submitted no evidence as to consideration.

6. Contracts A and B should be construed together.

7. So construed, the contract clearly gave him not only a one-

half royalty interest but a vested right to a lease upon the conditions heretofore stated, which right existed as long as his royalty rights continued and could be exercised at any time upon demand.

8. His royalty rights having been kept alive on the whole tract by virtue of continuing production on the southeast quarter, he had a continuing right to a lease on the southwest quarter, beginning not later than one year after the expiration of the Skow lease on September 27, 1931.

9. Maria Riffel, being bound—as found by the trial court—by the provisions of Contract B as well as by Contract A, he is entitled to a lease from her.

10. If the validity of the Derby-Carey lease be upheld, thus barring specific performance by Maria Riffel, he is entitled to judgment against her for $15,000, the market value of the lease.

The principal contentions of Maria Riffel, appellant, are:

1. Contract A was a *conveyance only of a royalty interest;* it did not convey to Dieter any interest in the minerals in place; it gave him no right to a lease himself but only the right, for a limited period, to secure another lease after expiration of the outstanding lease without production, for the purpose of securing development.

2. Contract B is not merely explanatory of Contract A. It modifies the agreement, purports to give Dieter additional rights, and is in fact a new contract.

3. Contracts A and B were not between the same parties and therefore cannot be considered together.

4. If Contract B grants lease rights to Dieter she is not bound by it because (a) it is unenforceable against her under the statute of frauds, being unsigned by her; (b) it violates the rule against perpetuities.

5. If Dieter had any lease rights under either Contract A or B he had forfeited them by his laches, abandonment of such rights, and by assignment of all his royalty rights.

There is presented at the very start, in considering the contentions of both parties, the question of the nature, the construction and effect of Contract A. Clearly the primary purpose of the instrument was to convey to Dieter on-half of the *royalty* rights of the Riffels in any production on the 280 acres. The instrument was headed "Sale of Oil and Gas *Royalty.*" The granting clause conveyed "a ½ interest in and to the said royalty rights." "Royalty" was expressly defined in the instrument as "all oil and gas reserved

or any money received for oil or gas," under the then-existing lease or on any other leases on the land. Nowhere in the instrument are there any provisions which could be construed as conveying to Dieter any interest in the minerals in place. (*Carlock v. Krug,* 151 Kan. 407, 412, 99 P. 2d 858; *Rutland Savings Bank v. Steele,* 155 Kan. 667, 672, 127 P. 2d 471.) Dieter's own testimony, which we need not recite, clearly showed that he so construed the instrument.

In addition to sale of royalty, Contract A also had a provision as to lease rights. Clearly the primary, if not the sole purpose of that provision, was to secure development in order that Dieter's royalty rights might yield return to him. On the southwest quarter there was then an outstanding five-year lease (Skow lease) which, in the absence of production, would expire on September 27, 1931.

In the paragraph beginning with the word "Provided" in Contract A, *supra,* it was provided that if no well were drilled under the existing lease the Riffels would make another lease and the nature of such second lease was definitely described. It was to be a lease *"insuring development* of said land for oil and gas *within one year after expiration or forfeiture of said present lease."* In other words the second lease the Riffels were to make must *insure development not later than September 27, 1932.* The Riffels were to have six months after September 27, 1931, to make *such a lease,* which, we repeat, whenever made, was to require development by September 27, 1932. If Riffels did not make "such a lease" within the six-month period, Dieter was to have "the right *to secure such a lease."* (Note that he was not given the right "to secure" a one-year lease beginning from the date executed.) Accordingly, even if the doubtful word "secure" be interpreted to mean that he had the right to take a lease himself, as lessee, the only lease he would have a right to take would be *"such a lease"*—that is, a lease *insuring development within one year after September 27, 1931.*

There is no contention that when the six-month period after September 27, 1931, was up and the Riffels had not made a new lease he "secured" or even demanded such a lease. It follows that even if the lease provision of Contract A be construed most favorably to him all lease rights which he could have exercised expired on September 27, 1932. After that neither he nor anyone else could write such a lease as the one specifically defined. It is true that the contract provided that "this agreement shall continue and the roy-

alty rights of grantee shall continue so long and whenever oil or gas is produced from said land." But continuance of the contract by continuing production could not give to Dieter any greater lease rights than what was provided in the contract. It follows that when Mrs. Riffel leased to Reed in January, 1943, Dieter had no lease rights under Contract A, under any construction of the instrument. It follows, in turn, that since Contract B was not recorded, and neither Reed, Derby nor Carey had any actual notice of its existence when they took as lessees, they are not bound by any provisions of Contract B and their title was rightfully quieted. We find no force in Dieter's contention that their rights were affected by information received after they became lessees but before drilling operations were begun. Their rights were fixed as of the date when they took as lessees.

We note one other contention of the cross-appellant as to the rights of Derby and Carey. He contends that they were not entitled to judgment quieting title because no valuable consideration was shown to support the Reed lease or its assignment. In the first place it may well be doubted whether Dieter, having no lease rights in the land when the lease to Reed was made and assigned, is in position to attack the validity of their lease. Passing that point, the trial court found (Finding No. 9) that the lease from Maria Riffel to Reed was "for a valuable consideration." The cross-appellant did not move to set aside this finding of fact, as far as we can discover from the record. On the contrary, he moved for judgment upon the findings which admits for purposes of the motion that the findings of fact are supported by evidence. (*Taggart v. Yellow Cab Co. of Wichita,* 156 Kan. 88, 93, 131 P. 2d 924; *Coryell v. Edens,* 158 Kan. 771, 772, 150 P. 2d 341.)

It is not denied that the lease to Reed recited a consideration of $160 and in his opening statement counsel for cross-appellant stated that he believed the evidence would show that the Reed lease was for a consideration of $160. Section 16-107, G. S. 1935, provides: "All contracts in writing, signed by the party bound thereby, or his authorized agent or attorney, shall import a consideration." (See, also, G. S. 1935, 16-108.) This statutory rule is in line with the general rule both as to written contracts and conveyances. (17 C. J. S. 1221; 26 C. J. S. 601; *Chisholm v. Snider,* 145 Kan. 573, 66 P. 2d 606.)

Lastly, it does not appear that the question of no consideration

was raised in the court below. The lease rights of Derby and Carey were properly quieted as against all defendants.

We next consider Contract B, and particularly the trial court's conclusion of law No. 4, that Maria Riffel is bound by it.

Contract B clearly constituted a new agreement between John Riffel and Dieter. We need note only some of the modifications. Under Contract A Riffel had *six months* in which to make a new lease after termination of the existing lease and the new lease had to insure *development* within a year after termination of the existing lease. Under Contract B he had *one year* in which to get "a *producing*" well drilled on the lease. Under Contract A, whatever lease rights Dieter had expired not later than September 27, 1932. Under Contract B, he claims a perpetual right to a lease as long as production continues on any part of the 280 acres. There are other substantial differences which need not be noted.

The record does not disclose the date of Riffel's death. It only appears that he died prior to January 21, 1943, the date upon which Maria Riffel made the lease to Reed. There is no contention that Dieter made any demand—as provided in the contract—for a lease from John Riffel during Riffel's lifetime, nor any demand upon Maria Riffel after his death, prior to the filing of his answer and cross petition in this action. The only reasonable interpretation of the cross petition is that he then for the first time was making such demand. Not only was Contract B not recorded but there is no contention that it constituted a covenant running with the land—clearly it was not. At best, Dieter had nothing more, upon John Riffel's death, than a claim against the estate. Whether administration was had upon Riffel's estate or if there was, whether claim was filed within the period required by the nonclaim statute, are matters not within the record or the instant issues. The record does disclose that the deed from John Riffel to his wife was recorded on October 28, 1936, about seven years prior to the filing of this action. Its recording constituted notice that she claimed title under deed, executed in 1927, and not as an heir to her husband's estate.

We consider now whether Contract B, which Maria Riffel did not sign, is unenforceable against her, under the statute of frauds. Appellant relies upon the provision of section 33-106, G. S. 1935, that no action shall be brought to charge a party "upon any contract for the sale of lands, tenements, or hereditaments, or any interest in or

concerning them," unless upon agreement, memorandum or note "in writing and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized in writing."

It is settled law in this state that a contract to execute an oil or gas lease is within the statute. (*Robinson v. Smalley,* 102 Kan. 842, 171 Pac. 1155; *White v. Green,* 103 Kan. 405, 173 Pac. 974; *Gates v. Syndicate Oil Corp.,* 132 Kan. 272, 295 Pac. 649; 49 Am. Jur. 519, note 15, 27 C. J. 213.)

It is also well settled upon unassailable grounds that if the original contract is required to be in writing in order to be enforceable, any substantial modification of the contract must likewise be in writing and signed by the party to be charged therewith. (49 Am. Jur. 609, 610; *Parkhurst v. Investors Syndicate* [1933], 138 Kan. 7, 12; 23 P. 2d 589; *Hoard v. Jones* [1925], 119 Kan. 138, 153, 237 Pac. 888; *Autem v. Coal Co.* [1916], 98 Kan. 379, 158 Pac. 13; *Banister v. Fallis* [1911], 85 Kan. 320, 116 Pac. 822.)

At this point we take note of cross-appellant's contention that since Contracts A and B were executed practically at the same time and as part of the same transaction they must be construed together and that having signed the first one and having stood silently by knowing that her husband had signed the second one, the statute of frauds does not protect appellant. Complementary documents are often and properly construed together. The general rule—in connection with the statute of frauds—is that an *unsigned* agreement clearly incorporated by reference in a *signed* agreement may be enforceable as part of the latter, but that an *unsigned* agreement— otherwise unenforceable under the statute—cannot be made enforceable by reference therein to a *signed* agreement. (27 C. J. 262, § 310; 37 C. J. S. 661, § 178b.) A contrary rule would defeat the very purpose of the statute. The cross-appellant seeks to hold Maria Riffel under Contract B which she did not sign and to which no reference is made in Contract A, which she did sign. The application of the statute cannot thus be avoided.

We agree with cross-appellant that appellant's position is not fortified by the fact that some time prior to the deal with Dieter the land had been conveyed to her by her husband. The record title was in John Riffel and there is no evidence that Dieter knew of the deed from Riffel to his wife. Dieter did, however, know of her inchoate or contingent interest as the wife of John Riffel, and took precau-

tion to secure her signature to Contract A. If he desired to bind her to a different agreement why did he not require her signature to it? His testimony relating to this part of the transaction is significant. He testified that the first conversation he had with either of the Riffels was when he saw Mrs. Riffel and "asked her if she wanted to sell their *royalty*"; that she said they had been "wanting to sell some" and he then went to see John, who "made about the same statement" as Mrs. Riffel had made. In rather lengthy testimony as to the negotiations immediately following he made no reference to any *lease* rights, the difference between the parties relating to disposition of rentals payable to the lessor under the existing leases. He finally decided to buy the royalty interest without receiving any of the rentals. Testifying further he said that he prepared Contract B, for the reason that he desired "to participate in the *rentals*" after the expiration of the oil and gas lease then existing. John Riffel stated that he didn't care about *rentals* under subsequent leases, so he, Dieter, drew up the letter (Contract B). Still no claims that in these conversations he asked to have any *lease rights as a lessee*. And upon cross-examination Dieter testified concerning the submission of Contract B to the Riffels:

"Well, I went up to Riffel's house and looked for them and told them I would be back the next day with it and I took the letter in there and, Mrs. Riffel handed me this. She can read German very fluently but she can't read English, so I read the letter to her, and I read it to John, and they said, 'Well, that sounds silly to us,' so she said, 'Take it down to the bank and see what Fred Collins thinks about it, and if he thinks it is all right, go ahead and sign it,' and so I took it down there and he said 'Well, it is just like the royalty contract was yesterday,' so John and I signed it there and then I got the royalty contract, and wrote in there what he wanted me to write in there, that I wasn't to get any rent. I wrote it in there at the bank."

And yet the contractual provisions upon which Dieter almost wholly relies now to support his claim to a lease are in Contract B and not in Contract A which he consistently and properly referred to throughout his testimony solely as "the *royalty* contract." Nothing in that record places this case with those cases wherein the equitable doctrine of estoppel has been interposed against parties invoking the statute of frauds.

Cross-appellant urges upon our attention *Gray v. Crockett*, 35 Kan. 66, 10 Pac. 452, and quotes from the opinion a passage—itself a quotation—as follows:

"If a married woman owns real property, but her title is not of record, and

her husband enters into a contract for the sale of it, of which she is informed at the time and to which she makes no objection, she will be *estopped from setting up her title to the land to defeat a suit brought against her husband for specific performance of his contract*, and so would her grantee." (Italics supplied.) (p. 74.)

In that case the vendee brought action against the *vendor*, record holder of title, for specific performance of a contract to convey, and under the facts of the case the wife, who had not signed the contract, was estopped from asserting ownership under an unrecorded deed not disclosed when her husband signed the contract. The husband being the record holder the vendee could doubtless make a valid agreement with him taking a chance on the husband surviving his wife. But he could not cut off the wife's contingent interest which would cease to be contingent in case she survived her husband. In the opinion in the Crockett case it was said (p. 76):

"Of course the plaintiff is only entitled to the enforcement of the contract of H. C. Long. He did not bargain for or purchase the supposed inchoate interest of Mrs. Long. She did not sign the contract, and was not asked to sign the same. The plaintiff is entitled to what his written contract calls for. *The decree, however, for the specific performance of the contract . . . must be so framed as to fully protect such inchoate interest of Mrs. Long, as the wife of H. C. Long, . . .*" (Italics supplied.)

And upon rehearing it was made clear (35 Kan. 686, 687) that the court was only dealing with the wife's claim of title under the undisclosed deed and not with her interest as wife of the vendor. To like effect was the holding in *Hollis v. Burgess*, 37 Kan. 487, 15 Pac. 536, in which again the action was against the husband, the vendor, and not against the wife, as in the instant case. In the opinion it was said, citing *Gray v. Crockett*, supra:

"Having complied with all the conditions of the contract, Burgess is entitled to a specific performance. The judgment rendered, however, must be modified in one particular. The contract was made by Hollis without his wife joining him in it, and only the contract made can be enforced. *The inchoate interest of the wife was not included in the agreement, and the judgment should be entered so as to protect that interest.*" (Italics supplied.) (p. 496.)

Of interest also is the case of *Herman v. Sawyer*, 112 Kan. 6, 209 Pac. 663, in which specific performance was sought of a contract to convey three quarter sections of land, one quarter section being a homestead. The wife had not signed and the question considered was whether the contract was divisible. On the ground that equity should enforce contracts as far as possible "to the end that justice

may be done" specific performance was ordered, exclusive of the homestead. The decision dealt with the question of homestead; there was no reference to the wife's inchoate rights and as far as the record discloses the question of the statute of frauds was not raised. See, also, *Hughes v. Cressler*, 130 Kan. 533, 287 Pac. 271, in which the court followed *Herman v. Sawyer* in dealing only with the homestead question. And again the action was not against the wife but against the husband, as vendor. These cases are not persuasive on the situation and issue here presented. Under any view they do not bear upon Maria Riffel's interest in the land, as the wife of the vendor. That interest, protected by the statute of frauds, would alone be sufficient to make Contract B unenforceable against her.

There remains only the question of whether—assuming Maria Riffel's oral consent—the bar of the statute was raised by performance under the contract on the part of Dieter. We find no substantial support for cross-appellant's contention on this point. What performance? The only performance claimed is the payment under the contract. It does not appear on the record that Maria Riffel received payment, but we will assume that she shared its benefits. The general rule, however, is that payment alone is not sufficient to constitute performance avoiding the statute. Factors such as payment, possession referable only to the contract, and the making of improvements, are given weight, but payment alone is not enough. (37 C. J. S. 765; 49 Am. Jur. 856, note 10; *Engelbrecht v. Herrington*, 103 Kan. 21, 24, 172 Pac. 715; *Baldwin v. Baldwin*, 73 Kan. 39, 84 Pac. 568.)

The doctrine of equitable estoppel has similar limitations. It is generally held that the doctrine should be interposed with caution (31 C. J. S. 250); that a necessary element of equitable estoppel is that the party invoking it has changed his position to his detriment in reliance upon the promise of the other party. (31 C. J. S. 275 *et seq.*) Also, that "where specific performance cannot be decreed, the same result cannot be accomplished under the doctrine of equitable estoppel." (31 C. J. S. 251.)

We conclude that Contract B is unenforceable against the appellant, Maria Elizabeth Riffel. This conclusion makes it unnecessary to consider other contentions of the parties.

As respects the finding that Maria Elizabeth Riffel is bound by the instrument referred to in finding of fact No. 6, herein called

Contract B, the judgment is reversed with directions to quiet her title against all of the defendants and to make appropriate modification as to the taxing of costs. In all other respects, both as to the appeal and the cross-appeal, the judgment is affirmed.