No. 64,475

BANK OF ALTON, individually and in its capacity of trustee and representative and assignee of the City of Kansas City, Kansas, *Appellee,* v. TOM T. TANAKA and NANCY TANAKA, d/b/a TANAKA BROTHERS FARMS, *Defendants,* and CHARLES SULLWOLD and DOROTHY MAE CHARBONEAU, *Appellants.*

(799 P.2d 1029)

Opinion filed October 26, 1990.

*David W. Carson*, of Carson & Fields, of Kansas City, argued the cause, and *Blaise R. Plummer*, of the same firm, argued the cause and was on the brief for appellants.

*R. Michael Steele*, of Sherman, Wickens & Lysaught, P.C., of Overland Park, argued the cause, and *Steven F. Coronado*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is another chapter in the continuing drama of Kansas local government efforts to promote industrial development by the use of Industrial Development Bond financing with a ten-year ad valorem tax moratorium on the property involved. This civil action grew out of that effort and was instituted to determine the right of the Bank of Alton, Alton, Illinois, (Bank) as trustee for the City of Kansas City, Kansas, (City) to collect back rent and to possess certain real estate and personal property held by defendants/appellants Charles Sullwold and Dorothy Mae Charboneau under a lease from the City. The district court granted the Bank's motion for summary judgment, holding Sullwold and Charboneau had no interest in the property, and granted judgment for back rent. Sullwold and Charboneau ap-

pealed to the Court of Appeals, and the case was transferred to this court pursuant to K.S.A. 20-3018(c).

The facts disclose that on June 1, 1982, the City issued industrial revenue bonds to finance the purchase of and improvements on a food processing warehouse at 5252 Speaker Road, Kansas City, from Midwest Boneless Meat Co. The building was then leased to Midwest Boneless Meat Co., which defaulted on its lease. At this juncture, the City sought to sell the property and engaged the services of Charles Sullwold, a licensed real estate broker. Sullwold produced Tom and Nancy Tanaka, who were interested in purchasing the property for the agreed purchase price of $500,000, to be paid $50,000 down with the balance in monthly payments over a ten-year period. The negotiations between the City and the Tanakas ultimately resulted in the City re-funding the original bond issue for $450,000 and leasing the warehouse to the Tanakas for a term of ten years at a monthly rental of $5,946.79. The lease provides that after the bonds and interest are paid off at the end of the term, the Tanakas shall purchase the property for $100. The lease also provides three remedies in case of default: acceleration of payments, termination and right to possession, and right to reenter and possess without termination. The lease was entered into pursuant to the Economic Development Revenue Bonds Act, K.S.A. 12-1740 *et seq.*

To administer the lease and retire the bonds, the City entered into a trust indenture with the Bank. The property was pledged and assigned to the Bank as security for the retirement of the bonds. The Bank was obligated to collect the rent, to make payments on bonds and interest thereon as they fell due, and to look after the property on behalf of the City and the bondholders. The trust indenture further made provision for the Bank's remedy in case of default. This provision and its interpretation is the heart of the controversy herein. It will be discussed more fully later in this opinion.

After approximately one year, the Tanakas abandoned the property and assigned their lease to Sullwold and Charboneau. Sullwold informed the Bank of the assignment. The Bank made no immediate response. The Bank denies that it, the City, or any bondholder consented to the substitution of tenants. Sullwold and Charboneau, however, contend they assumed the Tanakas' lease

obligations and made the monthly rental payments from July 1986 to August 1987 and that the Bank's receipt and acceptance of the rent constituted an acknowledgement of their rights under the lease.

In August 1987, appellants Sullwold and Charboneau advised the Bank they were no longer able to continue paying the rent. They sought an option to sell the property so they could pay off the bonds and recoup their investment. In their counter-claim, Sullwold and Charboneau contend the Bank, through its president, Paul Utterback, agreed orally to allow them to sell the property. Further, they allege they made contact with several prospective purchasers but found the prospective purchasers' interest in purchasing evaporated after they talked to the Bank or bondholders. Sullwold and Charboneau claim these actions by the Bank and bondholders constitute tortious interference with their prospective contracts and breach of contract; they seek damages from the Bank and bondholders or to have the property placed in a constructive trust. Finally, appellants contend the bonds were unlawfully issued because they were not issued in compliance with the statutory purposes of the Economic Development Revenue Bonds Act.

The district court granted the Bank's motion for summary judgment, ruling that Sullwold and Charboneau had no interest in the property, and awarded the Bank immediate possession and a judgment of $142,722.96 for unpaid rent. Sullwold and Charboneau appeal.

The scope of appellate review of a summary judgment is well established. The trial court is required to resolve all facts and inferences which may be reasonably drawn from the evidence in favor of the party against whom the ruling is sought. The same rule is applied on appeal, and where reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Bacon v. Mercy Hosp. of Ft. Scott,* 243 Kan. 303, 306-07, 756 P.2d 416 (1988); *Progress Enterprises, Inc. v. The Litwin Corporation,* 225 Kan. 212, 213, 589 P.2d 583 (1979). With these rules in mind, we consider the issues.

## ISSUE I

The first issue is whether Sullwold and Charboneau had an equitable mortgage interest in the property. Sullwold and Charboneau allege they hold equitable rights in the property because the lease between the Tanakas and the City was actually a mortgage. They premise this argument upon the lease provision obligating the Tanakas to purchase the property upon the expiration of the lease.

In *Misco Industries, Inc. v. Board of Sedgwick County Comm'rs*, 235 Kan. 958, 685 P.2d 866 (1984), we considered a similar issue. The City of Wichita issued industrial revenue bonds to finance the purchase and construction of an office building. 235 Kan. at 959. To pay off the bonds, the City entered into a lease with Misco Industries (Misco) which contained an option to purchase clause. 235 Kan. at 959. Misco brought the action to protest the payment of a mortgage registration tax. 235 Kan. at 960.

Initially, we determined that if a mortgage existed, the City was the mortgagor as owner of the property pledged to secure a debt and the industrial revenue bondholders were the mortgagees, not Misco. 235 Kan. at 961. But in the final analysis we determined that a mortgage did not exist. 235 Kan. at 966. We held that to constitute a mortgage there must be an intent by the mortgagor to pledge property for the payment of a sum of money or performance of an act. 235 Kan. at 964. We found the parties, the City and Misco, did not intend to create a mortgage. The instrument was entitled "Lease Agreement" and contained an option to purchase. The lessee did not acquire an estate in the land until the option was exercised. Since the option had not been exercised, no mortgage existed. 235 Kan. at 965-66.

In *City of Lenexa v. Board of Johnson County Comm'rs*, 237 Kan. 782, 703 P.2d 800 (1985), we considered whether a document entered into by the City of Lenexa and several other parties constituted a lease or a mortgage. We again concluded that lease agreements executed in specific accordance with the industrial revenue bond statutes were not mortgages, but leases. 237 Kan. at 784.

Finally, we review our holding in *In re Petition of City of Moran*, 238 Kan. 513, 713 P.2d 451 (1986). In *Moran*, the City issued industrial revenue bonds pursuant to K.S.A. 12-1740 *et seq.* to finance the acquisition of land and construction of a build-

ing. 238 Kan. at 514. The City then entered into a lease-purchase agreement with The Farmer's Cooperative Association (Cooperative) to pay off the bond premium and interest. 238 Kan. at 514. Subsequently, the Cooperative delivered promissory notes to the Wichita Bank for Cooperatives and executed security agreements pledging equipment and fixtures owned by the Cooperative as collateral. 238 Kan. at 515. In an action originated by the Bank, we were required to determine whether the lease-purchase agreement constituted an installment sale governed by Article 9 of the Uniform Commercial Code (UCC). 238 Kan. at 518. We held as follows:

"Where a city or county, under the Economic Development Revenue Bond Act, owns a facility which includes the land, furnishings, and equipment, and leases it for a period of years at a stipulated rental under a lease-purchase agreement which contains a stipulation that the lessee shall have the right, during or at the expiration of the agreement, to purchase the facility, if the lessee so elects, at a fixed price, there is no complete sale. The lessee does not acquire an estate beyond the lease interest until he has elected to accept the offer and has paid or tendered the purchase price set out in the lease-purchase agreement." 238 Kan. at 521-22.

In the case at hand, the City and the Tanakas did not create a mortgage. The City pledged the building and all improvements as security for repayment of the bond issues. Thus, if a mortgage was created, the City was the mortgagor, the industrial revenue bondholders were mortgagees, and the Tanakas, as the lessees, would not be involved. The option, stated in the form of an obligation to purchase, does not change this conclusion because, prior to termination of the lease agreement, the Tanakas had the option to purchase the property for a fixed price. As long as the Tanakas refrained or were prevented from exercising their option, the Tanakas remained lessees with no more than a leasehold interest in the property. Upon expiration of the lease, the Tanakas held an option to purchase the property for a fixed price after full payment of the issued bonds plus interest. The purchase provision of the lease, even though stated in the form of an obligation, was conditioned upon the Tanakas having paid the full amount of the bonded debt plus interest. Thus, the Tanakas were not converted into mortgagors and the City into a mortgagee. Before expiration of the lease, there was no conditional convey-

ance of title to the property from the City to the Tanakas creating a lien on the property in the City's favor.

In addition, it is apparent the City and the Tanakas did not intend to create a mortgage. The document was entitled "Lease Agreement" and was entered into pursuant to the Economic Development Revenue Bonds Act, K.S.A. 12-1740 *et seq.* K.S.A. 12-1740 and K.S.A. 12-1741 explicitly authorize the City to issue revenue bonds and to enter into leases to pay the cost of purchasing, constructing, or improving facilities similar to those presently at issue. Since the record clearly establishes the parties executed the lease pursuant to K.S.A. 12-1740 *et seq.*, we find the document was a lease, not a mortgage. Therefore, since the Tanakas did not hold an equitable mortgage on the property, they could not assign an equitable interest to Sullwold and Charboneau.

To further fortify the Bank's position, we note that Article X of the lease expressly prohibits the Tanakas from assigning the lease or in any way transferring it without the written consent of all the bondholders. There is no evidence the bondholders or the City consented to the Tanakas' assignment to Sullwold and Charboneau. Thus, the assignment is void.

## ISSUE II

The next issue we consider is Sullwold's and Charboneau's allegation that the issuance and re-funding of industrial revenue bonds to purchase the commercial food processing warehouse was not in accordance with the purposes of the Economic Development Revenue Bonds Act. The appellants contend the bonds were issued merely to provide a tax exemption to the bondholders.

K.S.A. 12-1740 states:

"[T]he purpose of this act [is] to promote, stimulate and develop the general welfare and economic prosperity of the State of Kansas through the promotion and advancement of physical and mental health, industrial, commercial, agricultural, natural resources and of recreational development in the state; to encourage and assist in the location of new business and industry in this state and the expansion, relocation or retention of existing business, industry, and health development; and to promote the economic stability of the state by providing greater employment opportunities, diversification of industry, and improved physical and mental health, thus promoting the general welfare of the citizens of this state by authorizing all cities and counties of the state to issue revenue bonds . . . ."

Appellants' argument is without merit. In Article II § 2.1(b), (c) of the lease, the City represents that its governing body finds the bond issuance in furtherance of the Act's public purposes. Similarly, the Tanakas also acknowledge that leasing the commercial food processing warehouse will further the public purposes of the Act. We find no evidence in the record to support the claim that the bonds were issued in violation of K.S.A. 12-1740.

Mere failure of the business does not support a claim that the industrial revenue bonds were unlawfully issued. An unsuccessful attempt to improve the economies of the state and its citizens does not render bonds issued for that purpose unlawful. Such a holding would be in direct contravention of the stated purposes of the statute, making the issuance of industrial revenue bonds available only for the well-established, safe business which does not need such bonds, thus stunting economic growth. Furthermore, there is a presumption the governing body of the City acted reasonably. It is appellants' duty to show the unreasonableness of the City's action. *Restaurants of Wichita, Inc. v. City of Wichita,* 215 Kan. 636, 641, 527 P.2d 969 (1974); *Eastborough Corporation, Inc. v. City of Eastborough,* 201 Kan. 491, 495, 441 P.2d 891 (1968). There is no such showing here.

## ISSUE III

Sullwold and Charboneau next argue it was error to grant summary judgment in light of an oral contract between them and the Bank. Sullwold and Charboneau contend they entered into an oral agreement with the Bank giving them the right to sell the property; in return, they renovated the property, maintained utilities throughout the winter months, and attempted to market the property expeditiously. Sullwold and Charboneau assert that the Bank breached the oral contract when its president, Paul Utterback, contacted prospective buyers and offered the property for sale at less than the listed price, thereby effectively preventing Sullwold and Charboneau from selling the property.

The district court ruled that any purported oral agreement for the sale of land between Sullwold and Charboneau and the Bank was void in contravention of the trust indenture, was a violation of the Statute of Frauds, and lacked consideration.

Under the Kansas Statute of Frauds, K.S.A. 33-106, a contract for the sale of land is not enforceable unless it is in writing and signed by the party against whom an action is brought.

No one claims the Bank signed a written contract with defendants. Hence, the Statute of Frauds renders the alleged oral contract unenforceable unless there are equitable considerations which remove it from the statute's application.

But, before we consider such equities, let us first consider a condition precedent thereto: whether the Bank had authority, either express or apparent, to enter into an oral contract on behalf of the City. If no authority exists, there is no contract regardless of the Statute of Frauds. The Bank's authority to lease or sell the trust property is set out in §§ 903 and 904 of the trust indenture.

Section 903 provides:

"*Surrender of Possession of Trust Estate; Rights and Duties of Trustee in Possession.* If an Event of Default shall have occurred and be continuing, the Issuer, upon demand of the Trustee, shall forthwith surrender the possession of, and it shall be lawful for the Trustee, by such officer or agent as it may appoint, to take possession of all or any part of the Trust Estate, together with the books, papers and accounts of the Issuer pertaining thereto, and including the rights and the position of the Issuer under the Lease, and to hold, operate and manage the same, and from time to time make all needful repairs and improvements as shall be deemed wise by the Trustee; and the Trustee may lease the Project or any part thereof, in the name and for account of the Issuer, and collect, receive and sequester the rents, revenues and receipts therefrom, and out of the same and any moneys received from any receiver of any part thereof pay, and set up proper reserves for the payment of all proper costs and expenses of so taking, holding and managing the same, including without limitation (a) reasonable compensation to the Trustee, its agents and counsel, (b) any charges of the Trustee hereunder, (c) any taxes and assessments and other charges prior to the lien of this Indenture, which the Trustee may deem it wise to pay, and (d) all expenses of such repairs and improvements, and the Trustee shall apply the remainder of the moneys so received in accordance with the provisions of *Section 908* hereof. Whenever all that is due upon the Bonds shall have been paid and all defaults made good, the Trustee shall surrender possession of the Trust Estate to the Issuer, its successors or assigns, the same right of entry, however, to exist upon any subsequent Event of Default. While in possession of such property, the Trustee shall render annually to the Issuer and the Company a summarized statement of receipts and expenditures in connection therewith.*"

Section 904 states:

"*Sale of Issuer's Interest in the Project in Event of Default.* If an Event of Default shall have occurred, and subject to the rights of the Company under Article IX of the Lease, the Issuer shall, upon the request and at the written direction of the Trustee (given at the written direction of the Owners of 25% of the Bonds Outstanding), sell its interest in the Project or any part or parts thereof (which sale may be to the Bondholders for cash or in consideration for the forgiveness of all or any portion of the amounts owed in respect of the Bonds or otherwise under this Indenture or both), and shall cooperate with the Trustee in the offering for sale and sale of its interest in the Project, including the employing of such brokers or agents, the making of such repairs and improvements to the Project, and the taking of such other actions as shall, in the judgment of the Trustee, be necessary or appropriate in connection therewith. The net proceeds of such sale, after deducting all of the Issuer's and Trustee's reasonable expenses in or in connection therewith, including without limitation, all repossession costs, brokerage commissions, legal expenses and expenses of preparation for sale, shall be deposited in the Bond Fund and applied as provided in *Section 909* hereof. The Issuer shall not be required to incur any costs in connection with such offer for sale or sale, other than those to be paid out of the proceeds of sale or out of funds advanced by the Bondholders for such purposes."

Upon examination of the foregoing provisions, we find that upon default the Bank had express authority to take possession of the trust property and lease or sell it. Thus, appellants' oral contract claim is not barred by the Bank's argument it lacked authority to assign its right to lease or sell the property.

We now proceed to the Statute of Frauds issue.

It is a well accepted principle of law that the Statute of Frauds was enacted to prevent fraud and injustice, not to foster or encourage it, and a court of equity will not ordinarily permit its use as a shield to protect fraud or enable one to take advantage of his own wrongdoing. *Harold v. Harold,* 218 Kan. 284, 286, 543 P.2d 1019 (1975); *Powell v. McChesney,* 170 Kan. 692, 697, 228 P.2d 925 (1951); *Hazen v. Garey,* 168 Kan. 349, 359, 212 P.2d 288 (1949). Nevertheless, oral contracts for the sale of land can be enforced for equitable reasons. *Cooper v. RE-MAX Wyandotte County Real Estate, Inc.,* 241 Kan. 281, 290, 736 P.2d 900 (1987). The basis for removing the oral agreement from the Statute of Frauds is that one party has relied upon the agreement to his detriment and gross injustice would result if the oral agreement

was not enforced. 241 Kan. at 291; *Walker v. Ireton*, 221 Kan. 314, 319-20, 559 P.2d 340 (1977); *Schoonover v. Schoonover*, 86 Kan. 487, 489, 121 Pac. 485 (1912). Absent compelling equitable considerations, however, an oral contract for the sale of land will be found to be within the Statute of Frauds and, therefore, not specifically enforced. 241 Kan. at 292; *Jay v. Ellis*, 135 Kan. 272, 275, 10 P.2d 840 (1932); *Engelbrecht v. Herrington*, 103 Kan. 21, 24, 172 Pac. 715 (1918).

Partial performance of an oral contract for the sale of real estate has generally been accepted as the kind of a compelling equitable consideration justifying the removal of the contract from the operation of the Statute of Frauds. See *Crane v. Cheney*, 77 Kan. 815, 818, 91 Pac. 67 (1907); *Abrams v. Abrams*, 74 Kan. 888, 889-90, 88 Pac. 70 (1906). The true basis for the application of the doctrine of partial performance is that it is grossly unjust and inequitable for one party of the oral contract to rely on the contract and partially perform his obligations thereunder while the other takes advantage of the partial performance and repudiates the contract by invoking the Statute of Frauds. *Baldridge v. Centgraf*, 82 Kan. 240, Syl. ¶ 1, 108 Pac. 83 (1910).

Certain conditions, however, must be met before partial performance will take an oral contract for the sale of real estate out of the Statute of Frauds. The contract must be fully made and completed in every respect, except for the writing, and the parol agreement must be certain, clear, unambiguous, and unequivocal. The oral contract must be fair, reasonable, and just. See *Bowen v. Galloway*, 125 Kan. 568, 572, 264 Pac. 1038 (1928). In addition, partial performance of the oral contract will not take it out of the Statute of Frauds where the performing party can be compensated in money. *Gates v. Syndicate Oil Corp.*, 132 Kan. 272, 278, 295 Pac. 649 (1931). Finally, the asserted partial performance must have been performed with the knowledge, consent, or acquiescence of the party to be charged. 73 Am. Jur. 2d, Statute of Frauds §§ 397-454.

Delivery of possession of the real estate to the purchaser and the making of improvements to the real estate are two common acts of partial performance relied upon to prevent operation of the Statute of Frauds in oral real estate contract cases. 73 Am. Jur. 2d, Statute of Frauds § 412, pp. 39-40, § 425, p. 55. It is

generally held that the delivery and assumption of possession of land under, pursuant to, and in reliance on a parol contract is sufficient partial performance to take the case out of the Statute of Frauds. 73 Am. Jur. 2d, Statute of Frauds §§ 412-423.

It is, however, required that the possession by a purchaser, relied upon as partial performance, must have been taken in good faith with the knowledge, consent, or acquiescence of the vendor. And, where the purchaser is permitted to continue in possession and make improvements, with the knowledge of the vendor, consent to the possession may be inferred. 73 Am. Jur. 2d, Statute of Frauds § 414, p. 42.

Furthermore, for possession to take an oral contract out of the Statute of Frauds, there must be a visible change of possession. It cannot be merely the continuation of a former possession claimed under a different right or title. However, in *Edwards v. Fry*, 9 Kan. 417 (1872), we held in speaking to this issue that a vendee in an oral land purchase contract who pays part of the purchase price and makes improvements thereon is entitled to specific performance even though he was already in possession of the land at the time of the contract. 9 Kan. at 424. In *Baldwin v. Baldwin*, 73 Kan. 39, 45, 84 Pac. 568 (1906), we held that where possession is relied upon as partial performance to take a case out of the statute of frauds, the character of the possession must be notorious, exclusive, and in pursuance of the contract.

With the foregoing rules in mind, where Sullwold and Charboneau's statement of facts is taken as true for the purposes of a review of the summary judgment, a question of fact is presented concerning their possession, the making of repairs, and, finally, the matter of the oral contract for the sale of the trust property.

With regard to the finding that there was no consideration for such a contract and for back rent, each of these issues fall if appellants successfully sustain their burden on the oral contract claim.

The summary judgment was improperly granted on appellants' counter-claim.

The judgment of the district court is affirmed on issues one and two and is reversed and remanded for trial on issue three.